**BENDINGER, CROCKETT,**
**PETERSON & CASEY**
Milo Steven Marsden (4879)
Jeffery S. Williams (6054)
170 South Main, Suite 400
Salt Lake City, UT 84101
Telephone: (801) 533-8383

FILED
U.S. DISTRICT COURT
DISTRICT OF UTAH

Attorneys for Defendant
Susie Strohm

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> CLEARONE COMMUNICATIONS, INC., FRANCES M. FLOOD, and SUSIE STROHM, <br><br> Defendants. | **SUSIE STROHM'S MEMORANDUM IN OPPOSITION PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br><br> Civil No.: 2:03 CV 0055 DAK <br> Honorable Dale A. Kimball |

Defendant Susie Strohm ("Ms. Strohm") joins in the arguments set forth in the

Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction filed by defendant

ClearOne Communications, Inc. ("ClearOne"). Ms. Strohm respectfully submits this separate

Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction to set forth several

points that are uniquely applicable to Ms. Strohm.[1]

---

[1] Under the Court's scheduling order, defendants had only one day to respond to the brief filed by the Securities and Exchange Commission ("SEC"). Ms. Strohm respectfully reserves the right to file a supplemental brief after the Court's March 3-4 hearing.

## STATEMENT OF FACTS

Ms. Strohm joined ClearOne Communications, Inc. ("ClearOne") in 1996 as the company Controller.  Deposition of Susie Strohm ("Strohm Dep."), at 11, attached as Exhibit 1; 2002 10-K at 59, attached as Exhibit 2.  Prior to joining ClearOne, Ms. Strohm had been employed with the Newspaper Agency Corporation for nearly 20 years.  Exhibit 1 at 10-11.  Ms. Strohm graduated with a degree in accounting from the University of Utah in 1983.  She received her M.B.A. from Westminster College in 1993.  Id. at 9.  She is not a CPA.  Id. at 10.

In April of 1997, ClearOne's Chief Financial Officer left the company and Ms. Strohm was asked to assume his duties.  However, because she was not a CPA, and because she had never worked for a publicly-traded company before, she was first given the title of Vice-President for Finance.  Id. at 15.  In 1998, she became the Company's CFO.  Exhibit 2 at 59.  Ms. Strohm made a practice of consulting with the Company's auditors, Ernst & Young, when accounting issues arose in the normal course of business.  Strohm Dep. at 60-61.  She served as CFO until August 23, 2001 when Randy Wichinski – a member of ClearOne's Board of Directors and a CPA – joined the Company and became its CFO.  Ms. Strohm asked to return to her position as Controller because it would allow her to avoid the extensive travel responsibilities she had as CFO and would thereby allow her to spend more time at home with her two young children.  Exhibit 1 at 39-40; see Statement of Misty Chalk ("Chalk Stmt.") at 50, attached as Exhibit 3.

About a year later, Mr. Wichinski, who is a Wisconsin native, decided to return home.  See ClearOne Form 8-K, dated 9-26-02, attached as Exhibit 4.  Ms. Strohm agreed to reassume the role of CFO, on the condition that her travel responsibilities would be reduced or eliminated.

Exhibit 1 at 49. Thus, from August 23, 2001 through September 26, 2002 – the bulk of the time covered by the allegations of the SEC's Complaint – Ms. Strohm was not the Company's CFO. Like other members of the Company's finance team, she continued to participate in preparation of the Company's financial statements, but she did not sign the Company's financial reports for fiscal 2002.[2]

In fiscal 2002, Ms. Strohm's total compensation was as follows: her annual salary was $114,615, and she was paid a bonus totaling $30,505. Exhibit 2 at 60. In fiscal 2001, Ms. Strohm's annual salary was $110,000, and she was paid a bonus totaling $37,000. Id.[3] During the time period covered by the allegations of the SEC's Complaint, Ms. Strohm has not (1) sold a single share of ClearOne stock, Strohm Dep. at 28; (2) purchased any ClearOne stock other than through the payroll deductions under the Company's employee stock purchase plan, id. at 27; (3) been granted any options on ClearOne stock, Exhibit 2 at 62; 2001 10-K, at 47, attached as Exhibit 5; (3) exercised any options on ClearOne stock, Exhibit 1, at 27-28; or (4) had any of her options repriced. Id.

ClearOne is managed by a team of executives including a President and Chief Executive Officer (CEO), and vice presidents of the Company's various reporting divisions. As of June 2001, ClearOne had a Vice-President of Sales/Chief Sales Officer (Tim Morrison), Vice-

---

[2]     In its brief, the SEC asserts that the seven quarterly and annual financial reports (Form 10-K and 10-Q) that ClearOne filed with the SEC between March 31, 2001 and September 30, 2002 were materially misstated. See Memorandum in Support of Plaintiff's Motion for a Preliminary Injunction and Other Relief ("SEC Mem.") at 19. Elsewhere in its brief, the SEC implicitly concedes it no longer is asserting claims regarding ClearOne's March 31, 2001 10-Q. See SEC Mem. at 2. Of the remaining reports, Ms. Strohm signed only the first and the last. Nor did she have any involvement in the preparation of (or sign) the Form S-3 Registration Statement that is the sole basis for the Commission's claims under the Securities Act, 15 U.S.C. § 77q. Exhibit 1 at 28-29.

[3]     In fiscal 2001, the Company did not meet its financial targets, and bonuses paid were unrelated to the Company's financial performance. See EY01 000038.

President of Finance/Chief Financial Officer (Susie Strohm), Vice President of Marketing

(Angelina Beitia); Vice-President of Operations/Chief Operations Officer (Eugene Kuntz); Vice

President of Human Resources (DeLonie Call); and a Vice-President of Conferencing Services

(Kevin Davis).

As Vice-President of Finance and CFO, Ms. Strohm's duties and responsibilities included

"really hands-on general ledger accounting," internal financial reporting, and general financial

reporting.  Exhibit 1 at 12, 14.  Ms. Strohm was the head of the company's finance team, and its

members reported to her.  Id. at 14:2-5.  On the other hand, the Company's sales staff – including

Misty Chalk – reported to Mr. Morrison, who was head of the sales team.  Statement of Timothy

Morrison ("Morrison Stmt.") at 8:14, attached as Exhibit 6.  This segregation of duties and

reporting authority was a part of ClearOne's system of internal control.  At her deposition, Ms.

Strohm explained that,

> There's a segregation of duties to ensure each step of the process.  Each person
> needs to do their own step of the process.  The order entire team would enter an
> order into the system and pick the order to be shipped. . . . . [T]he finished goods
> clerk would pull, physically, the product off of the shelf and put it on a conveyer
> belt, and then the shipping clerk, the person who actually gets the shipment ready
> for the delivery company, verifies what's on the belt and key onto the system that
> it was shipped against. . . .  And then that shipping – that value shipped file goes
> over to the accounts receivable clerk who then creates an invoice, and that's when
> the revenue would be recognized.  So I think there's a whole segregations of
> duties that each step of the process needs to happen in the right step to make sure
> that – to make sure that revenue gets booked properly."

Strohm Dep., at 82-83.  The ultimate outcome of this segregation of duties is that the finance

department – Ms. Strohm's department – receives "sales" numbers based on the outcome of the

sales department's – Tim Morrison's department's – actions.

**ClearOne's Distributors**

4

The evidence shows that Ms. Strohm's involvement in ClearOne's move to a new model for the distribution of its products was limited. Ms. Strohm was involved in the planning and implementation of ClearOne's move to distributors. She testified that as the sales model evolved to include "distributors," she consulted with Ernst & Young, the Company's outside auditors, "to make sure that we were doing everything to comply with the accounting literature." Strohm Dep. at 64. In those discussions, Ernst & Young stated that ClearOne's arrangements with distributors needed to include provisions so that "title needs to pass, there had to be no right of return, and there needed to be fixed payment terms." Id. ClearOne's contracts with its distributors were drafted to include provisions satisfying all of these guidelines. See EY02002360-68; EYM004631-44, attached as Exhibit 7.

Ms. Strohm also participated in initial discussions with a few of ClearOne's early distributors, to explain the accounting rules as she understood them. For instance, Jim Starin, the president of Starin Marketing, testified that he had a conversation with Ms. Strohm "in the formative stages, where Susie explained the accounting rules, which of course were foreign to me." Deposition of James Starin ("Starin Dep.") at 104. Ms. Strohm was not involved on a day-to-day basis in the relationship between ClearOne and its distributors. Those relationships were instead managed by Tim Morrison and other members of the sales team. Mr. Morrison and his staff handled all of the sales transactions with the distributors. Id. See also Starin Dep. at 24:6-26:6, attached as Exhibit 8. Indeed, the distributors have testified that Mr. Morrison made very clear that their dealings with ClearOne needed to be with Mr. Morrison. Mr. Starin testified that Mr. Morrison "told me he was king of [ClearOne] and that all issues regarding the company should go through him." Starin Dep. at 63.

Importantly, not one distributor has testified that he talked to Ms. Strohm about the so-called "pay as you go" terms that the SEC asserts ClearOne agreed to.  See Starin Dep. at 104-05; Deposition of Frederick William Oltz ("Oltz Dep.") at 78 ("No, I never had a conversation with her about that."); Declaration of Angelo Skiparnias; Declaration of David Francis.  Indeed, the only testimony the SEC can point to to claim that Ms. Strohm was involved in Tim Morrison's alleged agreement to allow distributors to "pay as you go" comes from Mr. Morrison and his "girl Friday" Misty Chalk.[4]  Their testimony, if it is admitted at all,[5] should not be credited.  In the first place, it should be more than clear that neither Morrison nor Chalk is a reliable witness.  If there was any inappropriate conduct by ClearOne employees, Morrison and Chalk are the offenders.  Moreover, both Morrison and Chalk are clearly disgruntled former employees of ClearOne – i.e., witnesses with an ax to grind.  Exhibit 6 at 17:17–21:20; Exhibit 3 at 63:9–64:13.

Second, while the SEC relies on vague and conclusory statements from Morrison and Chalk to claim that Ms. Strohm "knew" of the alleged "pay as you go" arrangements, the specific facts Morrison and Chalk testify to squarely contradict their conclusions.  For instance, Ms. Chalk testified that in the summer of 2001 – shortly after the distributor model was introduced – the sales staff attempted to change the terms of Starin's distribution contract to allow him to "swap product for what he didn't sell."  Statement of Misty Chalk ("Chalk Stmt.") at 34.  When

---

[4]      In his declaration, Brian Woodand, a junior cost accountant who formerly worked at ClearOne, states that he "overheard" conversations between Ms. Strohm and Judy Meyers that "indicated" ClearOne had pay-as-you-go arrangements.  Woodland Decl. ¶ 23.  Both Ms. Strohm and Ms. Meyers deny that any such conversations took place.  See Declaration of Judy Meyers ("Meyers Decl.") ¶ 12 (Exhibit 9).

[5]      Defendants intend to move to have the statements that Morrison and Chalk provided to the SEC stricken.  These statements are replete with "testimony" that, on its face, is conclusory and has absolutely no foundation.

she learned of this, Ms. Strohm told Ms. Chalk the contract could not be changed to allow product swapping.  Id. at 35.  Similarly, Ms. Chalk testified that in the fall of 2002, she told some distributors that they could return product.  Again, when Ms. Strohm found out about Ms. Chalk's statements, she said "absolutely not.  We're not taking that product back."  Id.  Likewise, despite his claim that Ms. Strohm knew ClearOne customers were "pay as you go," Mr. Morrison testified that "I also recall Susie Strohm and our credit group, after 90 or 100 days, placing MCSI on credit hold because they hadn't paid anything."  Exhibit 6 at 28.

**MCSI**

Morrison's testimony is fundamentally inconsistent with the SEC's theory regarding MCSi.  The SEC claims that Strohm "knew" about pay-as-you-go deals with distributors because of a single page of notes reflecting a single conversation with a representative of MCSI in August, 2001.  SEC Mem. at 11.  This conversation occurred after ClearOne had placed MCSI on credit hold because of its failure to bring its account current.  The notes appear to reflect that in the conversation, MCSI's CFO said that, with regard to the June, 2001 shipment, "they only needed to pay as they sold."  Strohm testified that she does not recall the conversations giving rise to the notes, but that she "would not have sat on information like that without following up," which she believes she did.  (Strohm Dep. at 116:20-22.)  Any concerns Ms. Strohm may have had about MCSI's payment terms were no doubt resolved by the fact that, shortly after placing MCSi on credit hold, ClearOne received a payment of approximately $800,000 from MCSi, bringing it current.

Moreover, when Ms. Strohm spoke to MCSI in August 2001, Starin was the only ClearOne distributor, and he had yet to execute his distribution contract.  Thus, it is simply

impossible that these notes, regarding MCSi, *who is not a distributor*, could reflect knowledge about alleged pay-as-you-go deals with distributors who were not yet doing business with ClearOne and had not yet entered into contracts with ClearOne.

**Production Audio**

The SEC also grossly mischaracterizes the evidence regarding ClearOne's transaction with Production Audio Services Pty. Ltd. ("Production Audio'), and regarding Ms. Strohm's knowledge of and dealing with it.

The SEC claims that the transaction was merely "an attempt to fabricate sales and artificially inflate revenue." SEC Mem. at 13. But the evidence – even the SEC's proffered evidence – contradicts that claim. The Declaration of Colin Stevenson, Production Audio's Managing Director, demonstrates that Production Audio had functioned as a distributor of ClearOne products in Australia since 1987." Declaration of Colin Stevenson ("Stevenson Decl."), ¶ 3 (Exhibit 10). In June of 2002, Production Audio approached ClearOne to see "whether Production Audio could become a distributor for ClearOne's new video conferencing products." Id. ¶ 5. The ultimate result of those discussions was that Production Audio became ClearOne's video conferencing product distributor for all of Asia, and an initial shipment of product for this newly expanded territory was sent to Production Audio at the end of June. Id. ¶¶ 5-7.

Mr. Stevenson also acknowledges that with respect to this purchase (and all other purchases) "Production Audio took title to products purchased from ClearOne when those products left ClearOne's warehouse in the United States," and that "Production Audio had no right to return products unless the products were defective or damaged." Id. ¶ 4. Further, Mr.

Stevenson directly contradicts the SEC's claim that "ClearOne sent the products to Production Audio with the understanding Production Audio would not have to pay ClearOne for the products until it sold them to third parties." SEC Mem. at 13. Mr. Stevenson states that the shipment was invoiced on 45-day terms, that he "was concerned that Production Audio may not be able to pay for the shipment on its usual 45-day terms due to the size of the shipment," and that he "called Morrison and he told me that Production Audio could have 90 days to pay for the shipment." Id. ¶ 11. Finally, Mr. Stevenson confirms that Production Audio in fact retrieved several of the V-There units and several of the PSR 1212 units and sold them to customers in its distribution area. Id. ¶ 15. These products were returned by customers who reported "engineering problems resulting in unreliable performance." Id.

The SEC also claims that when Production Audio approached ClearOne seeking to return these products because of these defects, "ClearOne determined not to properly account for the product return." SEC Mem. at 14.[6] To support this claim, the SEC relies almost exclusively on the Declaration of Brian Woodland, a relatively junior ClearOne accountant assigned responsibility for ClearOne's production costs – not its sales. Although the SEC obtained this declaration on January 27, 2003, it was not produced to the defendants until after the discovery cut-off, and defendants were thus effectively prevented from cross-examining Mr. Woodland. However, Mr. Woodland provided a set of handwritten notes he apparently made on a contemporaneous basis, and a type-written version of the notes. These notes tell a story

---

[6]     The SEC concedes that expert testimony is required to make out a claim that an accounting method violated GAAP and was improper. See Plaintiff's Response to Defendant Strohm's First Set of Interrogatories, at 6 (Int. No. 8). Notwithstanding this, the SEC has provided no expert testimony that ClearOne's accounting regarding the return by Production Audio is improper.

regarding Ms. Strohm's involvement in the Production Audio return that is far different from the story the SEC tells.

First, Mr. Woodland's notes make clear that the first time anyone spoke to Ms. Strohm about technical problems with the products ClearOne had sold to Production Audio was September 13, 2002. See Woodland Notes, CLRO 00585. Far from supporting a determination on the part of Ms. Strohm to improperly deal with Production Audio, Mr. Woodland's notes reflect that she understood the product was being returned for warranty work and other technical upgrades, but that it remained Production Audio property. Mr. Woodland states:

> Susie's suggestion [regarding Production Audio] was to do three things: (a) go ahead and upgrade the software and hardware on both the PRS1212's and the V-There's, (b) if our sales people sell a unit that can be pulled from the PAS stock, we should process a return for that unit, enter the inventory and credit memo our system, and sell the unit, and (c) if PAS sells a unit from its stock, we can drop ship it for them. . .

> When Craig mentioned that Fran wanted an RMA number and he assumed it was because PAS wanted a credit on their account, Susie seemed a little upset. *Her statement was that Colin [Stevenson] owned those products and that he shouldn't think otherwise.*

Woodland Notes, CLRO 00589 (Exhibit 11). In short, there is no basis to conclude that Ms. Strohm or anyone else had made a determination regarding the accounting for the Production Audio shipment.

## ARGUMENT

As ClearOne has noted, to get a preliminary injunction in an SEC enforcement action, "the Commission has to make a substantial showing of likelihood of success as to both a current violation [of the securities laws] and the risk of repetition." SEC v.Unifund Sal, 910 F.2d 1028, 1040 (2d Cir. 1990) (emphasis added). This substantial showing requires,

at a minimum, proof that a person is engaged or is about to engage in a substantive violation of . . . the [securities laws] or of the regulations promulgated thereunder. Accordingly, when scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue.

Aaron v. SEC, 446 U.S. 680, 700-01 (1980).

In its complaint, the SEC has asserted five causes of action against Ms. Strohm. It has asserted claims for (1) violation of Section 17(a)(1) of the Securities Act (Count I); (2) violation of Sections 17(a)(2) and (a)(3) of the Securities Act (Count II); (3) violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder; (4) aiding and abetting a violation of Sections 13(a) and 13(b) of the Exchange Act (Count VI); and (5) violation of Rule 13b2-2 under the Exchange Act. The SEC cannot make a substantial showing that Ms. Strohm committed violations of these provisions for the reasons set forth in ClearOne's Memorandum in Opposition to Plaintiff's Motion. Beyond the points raised in ClearOne's brief, the SEC cannot prevail with respect to Ms. Strohm for the following additional reasons.

## A.    The SEC Cannot Show Ms. Strohm Acted with Scienter.

The First and Third Causes of Action, under Securities Act section 17(a)(1)[7] and Exchange Act section 10(b), respectively, have long been held to require a showing of "scienter." See Aaron v. SEC, 446 U.S. at 701. The Sixth Cause of Action for aiding and abetting the falsification of books, records and accounts likewise requires a showing that Ms. Strohm "knowingly provide[d] substantial assistance" in bringing about the violation. 15 U.S.C. §78t(f)

---

[7]    An important distinction between the Section 17(a)(1) claim and the Rule 10b-5 claim is that the former arises under the Securities Act of 1933 and is, therefore, limited to securities offerings or sales. During the relevant time period, there was only a single offering by ClearOne, which closed on December 11, 2001. Ms. Strohm did not participate in the preparation of the S-3 documents in any way. Strohm Dep. at 28-29. As of December 11, 2001, Ms. Strohm was not CFO. Accordingly, there is no basis to make these claims against her. Moreover, as of December 11th, only Starin and vSO had ever entered into distribution agreements with ClearOne. The bulk of the SEC's allegations are after the relevant time period for the Section 17(a)(1) cause of action.

(aiding and abetting liability).  Indeed, in the complaint, the SEC concedes that to meet the
scienter requirement for aiding and abetting liability, it must show that Ms. Strohm acted with
"[e]ither willfulnes or a reckless indifference to a known obligation or set of facts."  Compl. ¶
103.  Finally, the Seventh Cause of Action for allegedly making false statements to accountants
requires, under 15 U.S.C. § 78m, a showing that Ms. Strohm "knowingly falsif[ied] any book,
record, or account described in" the relevant section.

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud," Ernst &
Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976), or, at the very least, a showing of alleged
"conduct that is 'an extreme departure from the standards of ordinary care, and which presents a
danger of misleading buyers or sellers that is either known to [Ms. Strohm] or is so obvious that
[she] must have been aware of it.'"  Hackbart v. Holmes Tire of Denver, Inc., 675 F.2d 1114,
1118 (10th Cir. 1982) (quoting Sunstrand Corp. v. Sun Chem. Corp., 553 F.2d 1033, 1045 (7th
Cir. 1977)).

Thus, it has long been held that negligence – even gross negligence – is insufficient to
establish scienter.  Rather, the SEC must prove that Ms. Strohm "knew of the potentially material
fact" and that she "knew that the failure to reveal the potentially material fact would likely
mislead investors."  City of Philadelphia v. Goldstein, 264 F.3d 1245, 1261 (10th Cir. 2001).
The SEC, then, must make a substantial showing that Ms. Strohm knew of the facts they allege,
and that she also knew the significance of those facts, in that they presented a danger of
misleading investors.  Id.; SEC v. Unifund Sal, 910 F.2d at 1040.

### 1.   The SEC Has Not Made a Substantial Showing That Ms. Strohm Knew About or Participated in Any Alleged Scheme to Defraud.

The gravamen of the SEC's Complaint is that ClearOne entered a scheme to defraud the investing public "by recording certain transactions with its distributors and resellers as sales when in fact the transactions did not meet the requirements of Generally Accepted Accounting Principles ("GAAP") for sales." (¶ 2.)  In particular, the SEC claims that ClearOne's recognition of revenue from sales to its distributors upon shipment of products to the distributors was improper because, according to the SEC, engaged in what the SEC refers to as "channel stuffing." (¶ 2, 5, 20.)  This is the practice, common throughout the sales industry, of having sales concentrated at the end of fiscal quarters.  The SEC's "channel stuffing" allegations are an old and tired tactic that federal appellate courts throughout the country have either marginalized or outright rejected as a claim of fraud.  Curiously, the SEC cites no federal appellate decisions. Instead, they rely on district court opinions – some of them unpublished – for the absolutely unsupportable proposition that "Channel stuffing is a fraudulent practice for purposes of a Section 10(b) or Section 17(a) violation." (SEC Mem. at 21-24.)  Every single one of the SEC's channel stuffing cases was decided on a motion to dismiss when the court was required to apply the well known standard that "all facts pleaded [in the complaint] are accepted as true, and all inferences are viewed in a light most favorable to the plaintiff."   In re Scientific Atlanta, Inc. Sec. Litig., 2002 LEXIS 25414, *13 (N.D. Ga. 2002) (Exhibit 13).  This well-pleaded complaint standard, which differs substantially from the preliminary injunction standard at issue here, hardly supports the proposition for which the SEC cites it.

Federal appellate courts, however, have held that "channel stuffing" allegations are insufficient to state a cause of action for fraud under the securities laws. For example, in Steckman v. Hart Brewing, 143 F.3d 1293, 1298 (9th Cir. 1998), the Ninth Circuit summarily rejected channel stuffing allegations as mere "speculation made in hindsight." Similarly, the First Circuit noted while evidence of channel stuffing has "some probative value" as to allegations of scienter, "that value is weak." Greebel v. FTP Software, Inc., 194 F.3d 185, 203 (1st Cir. 1999). The Greebel court went on to explain that, "[u]nlike altering company documents, there may be any number of legitimate reasons for attempting to achieve sales earlier. Thus, it does not support a strong inference of scienter." Id. Because management must rely on historical sales trends, must push new products into the market before all of the old products have sold, and is always at the mercy of economic downturns or unforeseeable catastrophic events, courts have noted that channel stuffing is perfectly legitimate and does not even constitute a GAAP violation. Bielski v. Cabletron Sys. (In re Cabletron Sys.), 311 F.3d 11, 34-35 (1st Cir. 2002); see also Steckman, 143 F.3d at 1298. These allegations have no bearing on the scienter requirement.

The SEC next claims that ClearOne's accounting was improper because according to the SEC, "ClearOne would . . . enter into undisclosed verbal agreements with its distributors and resellers whereby the distributors and resellers would agree to pay for the ClearOne merchandise as it was sold rather than in accordance with the written contracts ClearOne had with those entities." (¶ 2.) In its Memorandum, the SEC makes the astounding claim that "[t]he distributors made it clear in their declarations and deposition testimony that Flood, **Strohm** and other ClearOne personnel told them that, if they would accept end-of-quarter product sales, they could pay for this product as it was sold." SEC Mem. at 29. But the SEC cannot point to a single

14

statement by any distributor to support this claim.  To the contrary, the distributors have affirmed

they never talked with Ms. Strohm regarding so-called pay-as-you-go terms.  What the evidence

does show is that, to the extent there was misconduct, Morrison and Chalk are the wrongdoers –

not Ms. Strohm.  Oltz, for example, testified as follows:

> Q.     So you never have had a conversation
>        with Susie Strohm where she indicated that vSO had a pay-as-you-sell
>        arrangement with Gentner?
>
> A.     No, I never had a conversation with her about that.  Never felt I needed to.

(Oltz Dep. at 78:21-79:1.)  Similarly, Starin testified that he only had a single conversation with

Ms. Strohm about the terms of his arrangement when they were first setting up the distribution

model and that all she did was "explained the accounting rules" to him.  (Starin Dep. at

104:14-105:12.)

Mr. Skiparnias of PT&T fails to even mention Ms. Strohm in his declaration.

(Skiparnias Decl. ¶ 4.)  Mr. Francis, of NewComm, also fails to mention Ms. Strohm at all.  And,

similar to Skiparnias, he also points the finger at Morrison. (Francis Decl. ¶ 7.)

Contrary to the SEC's assertion, there is not a single distributor who says that they ever

even discussed a pay as you go arrangement with Ms. Strohm.  This is hardly a "strong showing"

that Ms. Strohm knew about side agreements, much less their effect, if any.

## 2.    Ms. Strohm Did Not Hide Anything From ClearOne's Auditors.

The SEC relies on Morrison's statement – which was not subject to cross-examination –

to assert that "Strohm rehearsed Morrison to mislead ClearOne's independent auditor, Ernst &

Young.  SEC Mem. at 16.  While the SEC would prefer to rely on Morrison, it would do well to

actually examine the E&Y workpapers, which tell a decidedly different story.

During the FY '01 audit, E&Y noted the 6/30/01 shipment to Starin and paid particular attention to it.  Furthermore, E&Y notes that the purpose of the shipment was "to meet [ClearOne's] sales targets." (EY01 000339.)  E&Y was informed of the alleged "channel stuffing," analyzed it, and properly determined their was nothing wrong with it under applicable accounting rules.  Similarly, during the FY '02 audit, E&Y stated that: "We will ensure that the Company is accounting for these distributor agreements in accordance with GAAP." (EY02 000308.)  To accomplish this, E&Y examined the growth in accounts receivable, performed test work, including assessing "the financial strength of customers with older account balances," and properly concluded that ClearOne "has adequately reserved for its potentially uncollectible accounts," and that "distributor accounts receivable appears to be reasonable." (EY02 000209.)

Finally, E&Y discussed the implementation of the distributor model with Tim Morrison who stated that the distributors' "initial order as a distributor was based on the region's past sales." (EY02 000309, EY02 000490.)  E&Y was well aware that there were quarter-end shipments and that distributors were not paying within terms.

Similarly, the transcripts of the analyst conference calls clearly show that the public was aware that most product was shipped at or near the quarter end and that accounts receivable were growing.  Analysts asked specific questions about these topics and the responses given acknowledged the issues and provided accurate information.

### 3.   Ms Strohm's Behavior is Fundamentally Inconsistent with an Intent to Defraud.

Ms. Strohm has never sold a share of ClearOne stock, other than to exercise some options, well before the relevant time period.  She is not a CPA and she looked to E&Y for

support in analyzing the myriad of changing, dense and reticulate accounting literature governing revenue recognition.[8]

Even for a specialist, this accounting literature can be daunting. The relevant revenue recognition accounting literature is attached hereto as Exhibit 12. A quick review shows that this issue is far more complex than the SEC would have the Court believe. The SEC's expert, Mr. Funk, who glibly states that SAB 101 requires assurance that product will not be returned (Funk rep. at 11), cites 191 pages of E&Y workpapers to support his statement. The evidence demonstrates that Ms. Strohm made a sincere effort to apply what she understood to be the rules; this is far from fraud. Indeed, while Mr. Funk disagrees with ClearOne's accounting, he has not opined that recording revenue in these alleged circumstances constitutes "an extreme departure from the standards of ordinary care."

---

[8]     In *In re: K-tel International, Inc.*, 300 F.3d 881, 889 (8th Cir. 2002) the Court explained:

Generally Accepted Accounting Principles, or GAAP, are "a series of general principles followed by accountants." United States v. Basin Elec. Power Coop., 248 F.3d 781, 786 (8th Cir. 2001). More specifically, GAAP "are the official standards adopted by the American Institute of Certified Public Accountants (the 'AICPA'), a private professional association, through three successor groups it established: the Committee on Accounting Procedure, the Accounting Principles Board (the 'APB'), and the Financial Accounting Standards  Board (the 'FASB')." Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 n.4 (2d Cir. 2000).

There are 19 different GAAP sources, any number of which might present conflicting treatments of a particular accounting question." Shalala v. Guernsey Mem'l Hosp., 514 U.S. 87, 101, 131 L. Ed. 2d 106, 115 S. Ct. 1232 (1995). The sources for GAAP include official publications consisting of APB opinions, FASB Statements and Accounting Research Bulletins (ARB). "Included in GAAP are the Financial Accounting Standards ('FAS') published by the [FASB]."Basin Elec., 248 F.3d at 786.

GAAP "are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." Thor Power Tool Co. v. C. I. R., 439 U.S. 522, 544, 58 L. Ed. 2d 785, 99 S. Ct. 773 (1979)

17

Ms. Strohm understood that title passing upon shipment and there being no right of return were the key issues and she policed the Company accordingly. For example, Ms. Strohm did not let Chalk engage in stock balancing, nor would she let Oltz return product (after Morrison told him he could). Furthermore, as Judy Meyers testifies, the finance department diligently attempted to collect from distributors, and successfully did so.

As discussed above, scienter requires an individual to act both knowing about the relevant fact and knowing that the fact poses a significant risk of misleading investors. The SEC provides no evidence that Ms. Strohm had the mental state required for a securities law violation

**C.    There is No Evidence that Susie Strohm Violated Sections 17(a)(2)—(3) of the Securities Act of 1933.**

Scienter is not required for a violation of Sections 17(a)(2) or (3) of the Securities Act, rather, negligence will suffice. <u>Aaron v. SEC</u>, 446 U.S. at 701-02. However, Section 17(a)(2) requires some kind of gain by Ms. Strohm – of which there was none. And, both Sections 17(a)(2) & (3) are limited to the period before December 11, 2001, the date of the PIPE transaction pursuant to ClearOne's S-3 registration. But at this time, only Starin and vSO had taken shipments as distributors; Ms. Strohm was the controller, not CFO; and, Ms. Strohm did not participate in the preparation of the registration statement, nor did she sign the registration statement. Ms. Strohm simply is not connected to the events giving rise to this cause of action.

<u>**CONCLUSION**</u>

For the reasons set forth above, Ms. Strohm respectfully requests the Court deny the SEC's motion for a preliminary injunction and other relief against her.

DATED this 27th day of February, 2003.

BENDINGER, CROCKETT, PETERSON
& CASEY

Attorneys for Defendant
Susie Strohm

19

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served via hand delivery

on this 27th day of February 2003, to the following:

Thomas M. Melton
Karen L. Martinez
SECURITIES AND EXCHANGE COMMISSION
50 South Main Street, Suite 500
Salt Lake City, UT 84144

Rodney G. Snow
Neil A. Kaplan
CLYDE SNOW SESSIONS & SWENSON, P.C.
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah  84111-2216

Max D. Wheeler
Richard A. Van Wagoner
SNOW CHRISTENSEN & MARTINEAU
10 Exchange Place, Suite 1100
Salt Lake City, Utah  84111

Exhibits/
Attachments
to this document
have **not** been
scanned.

Please see the
case file.