

Rodney G. Snow (Bar No. 3028)
Neil A. Kaplan (Bar No. 3974)
CLYDE SNOW SESSIONS & SWENSON, P.C.
Attorneys for Defendant ClearOne
One Utah Center, 13th Floor
201 South Main Street
Salt Lake City, Utah 84111-2216
Telephone:  (801) 322-2516

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | |
| Plaintiff, | : | **CLEARONE COMMUNICATIONS, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION** |
| v. | : | |
| ClearOne COMMUNICATIONS, INC., FRANCES M. FLOOD, AND SUSIE STROHM, | : | |
| Defendants. | : | Civil No.:  2:03CV0055DAK |



# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF MATERIAL FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

       A.    ClearOne is a small award-winning Utah company known for its
              products and people . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

       B.    ClearOne implements a distribution model in 2001 . . . . . . . . . . . . . . . . .  4

       C.    The Distributor Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

       D.    The alleged pay-as-you-sell discussions . . . . . . . . . . . . . . . . . . . . . . . .  10

       E.    The economy tanks and exacerbates unanticipated problems
              with the distribution model and products . . . . . . . . . . . . . . . . . . . . . . . .  12

       F.    ClearOne discussed and disclosed distribution channel problems . . . .  14

       G.    Sales near the end of the quarter . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

       H.    Product returns were within normal allowances . . . . . . . . . . . . . . . . . .  18

       I.    An employment dispute with Morrison triggers an SEC
              investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

       J.    ClearOne's expert report concludes revenue was properly
              recognized . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

       K.    ClearOne revises the distribution model and makes other changes . . .  23

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

       I.    The SEC has failed to meet its legal burden for a preliminary
              injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

              A.    The injunction statutes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

**TABLE OF CONTENTS (Continued)**

Page

B.   A preliminary injunction is an extraordinary sanction with
     a substantial risk of mistake because of an incomplete record  .  28

C.   The purpose of an injunction is not punitive . . . . . . . . . . . . . . .  29

D.   The two-prong test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

     (1)   The SEC must establish every element of each
           alleged violation on which it seeks an injunction . . . . . . .  30

     (2)   The SEC must establish scienter for the § 10(b) and
           § 17(a)(1) allegations, and the lack of scienter bears
           heavily on the remaining allegations . . . . . . . . . . . . . . . .  31

     (3)   The SEC must demonstrate a reasonable and
           substantial likelihood that ClearOne, if not enjoined,
           will violate security laws in the future . . . . . . . . . . . . . . .  32

     (4)   Under the totality of circumstances, there is no
           "reasonable and substantial likelihood" of a future
           violation by ClearOne  . . . . . . . . . . . . . . . . . . . . . . . . . .  33

     (5)   Adverse consequences of an injunction  . . . . . . . . . . . .  34

II.  ClearOne's revenue recognition was proper . . . . . . . . . . . . . . . . . . . . .  35

A.   "Channel stuffing" -- a red herring  . . . . . . . . . . . . . . . . . . . . . . .  36

B.   The Distributor Agreements: Clear and Unequivocal statements
     of the distributors' obligations . . . . . . . . . . . . . . . . . . . . . . . . . . .  37

     (1)   Minimum quantities, title passes, no right of return  . . . . .  38

     (2)   Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

     (3)   Full integration, nonwaiver, and modification by
           writing only . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  38

### TABLE OF CONTENTS (Continued)

<b>Page</b>

(4)    Distributors certified payment terms and accounts
payable to ClearOne's auditors . . . . . . . . . . . . . . . . . . . . . 41

(5)    Revenue recognition was proper based on the
obligations of the distributors, the information provided
to EY and applicable accounting standards . . . . . . . . . . 41

C.    The appointment of a special monitor is neither appropriate
nor necessary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

### TABLE OF CASES

Aaron v. Securities and Exchange Comm., 446 U.S. 680 (1980) . . . . . . . . . . . . . 31-34

Greater Yellowstone Coalition v. Flowers, 2003 W.L. 361562, page 4,
(10th Cir., 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Greebel v. FTP Software, Inc., 194 F.3d 185, 202-203 (1st Cir. 1999) . . .   37-38, 40-41

Hale v. Ford Motor Credit Co., 374 So. 2d 849.  (Ala. 1979) . . . . . . . . . . . . . . . . . . 41

Harvey v. Jasper Retirement Trust v. Ivax Corp., 920 F. Supp. 1260
(S.D. Fla.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

In re: Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002) . . . . . . . . . . . . . . . 38

In re Compaq Sec. Litig., 848 F. Supp. 1307, 1319-20 & n. 37 (S.D. Tex.1993) . . . . 37

In re Lotus Dev. Corp. Sec. Litig., 875 F. Supp. 48, (D. Mass.1995) . . . . . . . . . . . . 37

Manger v. Davis, 619 P.2d 687 , 690 (Utah 1980) . . . . . . . . . . . . . . . . . . . . . . . . . 39

Manor Nursing, 458 F.2d 1082 (2nd Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Mazurek v. Armstrong, 117 S. Ct. 1865, 1867 (1997) . . . . . . . . . . . . . . . . . . . . . . 29

## TABLE OF CASES (Continued)

Page

Monroc, Inc. v. Jack P. Parson Construction Company, 604 P.2d 901 (Utah 1979)  .  40

Quality Performance Lines v. Yoho Automotive, 609 P.2d 1340, 1342 (Utah 1980)  .  40

Reebok v. Marnatech Enterprises, Inc., 970 F.2d 552, 559 (9th Cir. 1992) . . . . . . .  43

Scotts Co. v. United Industries Corp., 315 F.3d 264, 283 C.A.4 (Va.), 2002 . . . . . . .  30

SEC v. Bausch & Lomb, 565 F.2d. 8, 18 (2nd Cir. 1977) . . . . . . . . . . . . . . . . . . . . .  30

SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . .  32,-34, 43

SEC v. Bonastia, 614 F.2d 908, 911 (3rd Cir. 1980) . . . . . . . . . . . . . . . . . . . . . 30-31

SEC v. Haswell, 654 F.2d 698, 699 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

SEC v. Pearson, 426 F.2d.1339 (10th Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . .  29, 34

SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) . . . . . . . . . . .  31

SEC v. Pros International, Inc., 994 F.2d 767, 769 (10th Cir. 1993) . . . . . . . . . .  31-34

SEC v. Savoy Industries, 587 F.2d. 1149, 1168 (D.C. 1978) . . . . . . . . . . . . . . . . .  34

SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2nd Cir. 1971) . . . . . . . . . . . . . . .  43

SEC v. Unifund Sal, 910 F.2d 1028, 1034 (2nd Cir. 1990) . . . . . . . . . . . . . . . . .  28, 31

SEC v. Wencke, 622 F.2d 1363, 1360-69 (9th Cir. 1980) . . . . . . . . . . . . . . . . . . . .  43

Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n,
641 F. Supp. 1179, 1190 (S.D.N.Y.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

U.S. v. United Medical and Surgical Supply Corp., CCH Fed. Sec. L. Rep.
¶ 97, 402 (10th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  34

Defendant, ClearOne Communications, Inc. ("ClearOne" or "the Company"), respectfully submits this memorandum in opposition to the Plaintiff, Securities and Exchange Commission's ("SEC" or "Commission") Motion for Preliminary Injunction.

## SUMMARY OF ARGUMENT

- The sanction sought by the SEC is drastic, adverse to the public interest, and the subject of disputed material facts.

- The SEC fails to meet its legal or evidentiary burden in establishing a reasonable and substantial likelihood that ClearOne will violate the securities laws prior to a full trial on the merits.

- The SEC's allegations of fraudulent "channel stuffing" distort the facts of the case and misstate the law.

- The distributors were and remain bound by the terms of a clear and unambiguous written obligation to pay for the products with no right of return.

- Preliminary injunctive relief is not warranted and will cause grave injury to ClearOne, its employees, and its investors.

- Changes to ClearOne's management and operations make a future securities violation substantially unlikely..

- The securities laws, principles of equity, and the undisputed facts require that the SEC's motion be denied.

## INTRODUCTION

The ultimate issue in this case is whether the Company's willingness to work with the distributors when they were unable to meet their legal obligation to pay, rather than strictly enforcing the 90-day terms of the contract, was a securities laws violation. More specifically, the Court will be called upon to examine, interpret, and apply complex and technical accounting guidelines, and decide at trial if the SEC has proven that the Defendants intentionally misapplied those accounting guidelines in order to improperly and prematurely recognize revenue.

At this point, certain facts are established by overwhelming evidence. First, that the distributors entered into legally binding contracts obligating them to pay for ClearOne's products within 90 days of the date of shipment. Second, large sales to those distributors were frequently made at the end of the fiscal quarter, at least in part to meet sales goals resulting in increased revenue. Third, the distributors took title to the product at shipment with no right of return. Fourth, at some point the distributors experienced trouble in paying for the product within the 90-day period. Therefore, the distributors could not meet their payment obligations, resulting in substantial increases over time in the Company's account receivables. Fifth, ClearOne's independent auditors, Ernst & Young ("EY"), knew and specifically considered all of the above facts in the audit process of ClearOne for each of the reporting periods in question and found the revenue recognition to be appropriate. Sixth, well before the SEC even began to investigate the case, the Company made management changes and had taken

-2-

substantial and meaningful steps to address the problems associated with its distribution channels.

The question before the court at this time is whether the SEC has met its heightened burden of establishing -- on an incomplete and disputed record -- both a past securities violation and a reasonable and substantial likelihood of a future securities violation. The sanction sought by the SEC has potentially severe, immediate and long-term consequences to ClearOne, Ms. Flood, and Ms. Strohm. As set forth below, the SEC has failed to carry its burden on either requirement and, accordingly, its motion for a preliminary injunction should be denied.

## STATEMENT OF MATERIAL FACTS

### A.   CLEARONE IS A SMALL AWARD-WINNING UTAH COMPANY KNOWN FOR ITS PRODUCTS AND PEOPLE.

1.     Clear One has been in business in Utah for over 15 years. It manufactures and sells award-winning products and employs hundreds of people in its Salt Lake City facility. Originally, ClearOne designed and manufactured radio station control and telephone interface products under the name of Gentner. While not a household word, the Gentner brand name was well known to broadcast engineers. It grew from that narrow niche to be a worldwide provider of audio and video conferencing products, as well as conferencing and business services. In 2002, ClearOne had over 300 employees, with a Utah payroll of $8,133,071.09, and over 10,500 shareholders of

record. The company has received recognition and acclaim for the innovation and technology of its products, as well as its role as an employer.[1]

## B. CLEARONE IMPLEMENTS A DISTRIBUTION MODEL IN 2001.

2. Prior to mid-2001, ClearOne marketed its products through a network of manufacturer's representatives and a small internal sales force.

3. During that time, ClearOne's major and much larger competitors, including Sony and Polycom, used a distribution model whereby they sold their products to large regional distributors, who in turn sold the products to dealers.

4. At the end of June 2001, ClearOne changed its domestic sales model to a distribution model. ClearOne's management believed that, by switching to this distribution model, ClearOne could, among other things, lower costs and increase its sales. It instituted a system of distributors with exclusive geographical territories who would buy ClearOne products to sell to ClearOne dealers (the "distribution model"). In consideration for receiving a large exclusive territory and the potential for increased sales revenues, the distributors were required to purchase substantial minimum amounts of products each quarter.

---

[1]      ClearOne's recognition and awards include: August 1998 -- ClearOne (then Gentner) was named "Utah Best Practices Awards" winner for excellence in motivating and retaining employees; May 2000 -- ClearOne was named the 2000 International Company of the Year by the World Trade Association of Utah; June 2000 -- ClearOne was selected by Frost & Sullivan as the recipient of the 2000 Market Engineering Competitive Strategy Award.; May 2000 -- ClearOne was awarded the "Excellence in Manufacturing" award for its efforts in the area of electronic commerce by the The Utah Manufacturing Extension Partnership. January 2002 -- ClearOne's VuLink™ video conferencing system won an Editors' Choice Award from TMC Labs and *Communications Solutions™* magazine.

5.     At the time ClearOne implemented its distribution model, it hired Tim Morrison as Vice President of Product Sales with the expectation that his sales background, although in a wholly unrelated industry, would be valuable to ClearOne in setting up and running the new distributor system.

6.     Morrison was responsible for managing all aspects of the distribution model, including setting the product "mix," forecasting the needs of the distributors for products, developing sales goals for distributors, and training distributors.

7.     Morrison was assisted in performance of his responsibilities by Misty Longwell Chalk ("Chalk"), a sales representative for ClearOne, who reported directly to Morrison.  Chalk was supposed to help the distributors in establishing their sales goals and inventory needs.

8.     In planning and implementing the new distribution model, ClearOne consulted with its outside auditors, EY, to discuss the accounting issues, including revenue recognition, associated with the adoption of the distribution model.  (See Deposition of Susie Strohm dated February 19, 2003 ("Strohm Dep."), at 8.)

**C.     THE DISTRIBUTOR AGREEMENTS.**

9.     The first Distributor Agreement under the new distribution model was entered into by  Starin Distributing, Inc. ("Starin Distributing"), a long-time manufacturer's representative for ClearOne.  The Starin Distributor Agreement was signed on September 12, 2001, by Starin Distributing's president, Jim Starin.  (See Exhibit 1, which is representative of all the Distributor Agreements in all material terms.)

-5-

10.     On October 16, 2001, vSO Marketing ("vSO"), whose principals had been long-standing ClearOne manufacturer's representatives,  became the second ClearOne distributor.  Mr. Mike Oltz ("Oltz") is vSO's Chief Executive Officer.

11.     On December 7, 2001, ClearOne entered into a Distributor Agreement with Pacific Technology & Telecommunications Corporation ("PT&T").  Mr. Angelo Skiparnias, president of PT&T, had not been a manufacturer's representative for ClearOne, but was a distributor for a company which ClearOne had recently acquired.

12.     ClearOne entered into a fourth Distributor Agreement on December 13, 2001, with NewComm Distributing, Inc. ("NewComm").  Another former ClearOne manufacturer's representative, Mr. David Francis, is the president of NewComm.

13.     Each of the four Distributor Agreements contain the following terms:

a.      The terms of sale for goods ordered by the distributor require payment within 90 days (net 90) or  with a discount of 2% if paid within 60 days (2% 60) from the date of shipment.  (See id., ¶ 3(d).)

b.      All products are to be shipped by [ClearOne] F.O.B. factory, [ClearOne's] point of shipment.  (See id., ¶ 3 (f).)

c.      Title to products purchased by the distributor passes when the item is shipped to the distributor, and the distributor bears the risk of loss or damage in transit.  (See id., ¶ 3(g).)

d.      The distributor is required to always maintain adequate inventory of ClearOne's products. The distributor and ClearOne are also required to  "discuss

inventory levels prior to the conclusion of each quarter, and such levels may be adjusted as mutually agreed." (Id., ¶ 5(a).)

  e. Distributors are required to purchase a minimum of $500,000 of ClearOne product each quarter. (See id., ¶ 5(b).)

  f. The distributors have no right to return product (except for defective product, and only upon written authorization from ClearOne).  (See id., ¶ 12(b).)

  g. The Distribution Agreement "contains the entire understanding of the parties with respect to the matters set forth herein, and supersedes all prior or contemporaneous representations, statements, understandings, and agreements."  (See id., ¶ 13(a).)

  h. The Distributor Agreement "is the sole understanding of the parties with respect to the matters set forth herein and supersedes all prior or contemporaneous written or oral understandings between the parties."  (Id., ¶ 13(d).)

  i. The Distributor Agreement provides that "waiver by either party or failure by either party to claim a breach of any provisions of this Agreement shall not be a waiver of any breach or subsequent breach, or have the effect of any waiver of such provisions."  (Id., ¶ 13 (f).)

  j. The Distributor Agreement provides that "[a]ll amendments to this Agreement shall be in a writing signed by the parties hereto."  (Id., ¶ 13(h).)

k.      The Distributor Agreement is governed by Utah law.  (See id.,

¶ 13(l).)

14.     Each of the distributors have confirmed their understanding that there was

no right of return of products when shipped by ClearOne and that title of the goods

passed to the distributors once the product was shipped.  (See, e.g., Deposition of Jim

Starin dated February 21, 2003 ("Starin Dep."), at 29; Deposition of Mike Oltz dated

February 19, 2003 ("Oltz Dep."), at 26, 92; Declarations of Angelo Skiparnias and David

Francis.)

15.     At all relevant times, each of the distributors repeatedly confirmed the

essential provisions of these Agreements, including payment terms, the passing of title

upon shipment and no right of return, by written and oral confirmations requested by EY

during the audit confirmation process.  (See Exhibit 2.)  The results of the confirmations

were sufficient for the purpose of the respective audits.

16.     In January 2003, each of the distributors was requested by ClearOne, as

part of its internal investigation of this matter, to certify the terms of their Distributor

Agreements.  The distributors were asked to confirm:

a.      Title passed to the distributor upon shipment by ClearOne and

there were no verbal or written agreements between the distributor and

ClearOne which altered the understanding that all products shipped became the

sole property of the distributor.  (See Distributor Certifications from vSO,

NewComm, PT&T and Starin, ¶ 1, collectively attached hereto as Exhibit 3.)

-8-

   b. The distributor, as owner of the product, has no right to return products ordered and shipped by ClearOne, except return of defective products. (See id., ¶ 2.)

   c. The distributor, as a result of ordering and taking title to the products, understands it is legally bound to pay for the products pursuant to the terms of the Distributor Agreement.  (See id., ¶ 3.)

   d. All products ordered by the distributor and shipped by ClearOne were products that the distributor considered saleable by the distributor.  (See id., ¶ 4.)

   e. The distributor is having difficulty in meeting the payment within the 90-day terms according to the Distributor Agreement and ClearOne is assisting the distributor in its collection efforts and the distributor intends to bring all payments for products purchased by the distributor from ClearOne current by June 30, 2003.  (See id., ¶ 5.)

   f. As of October 1, 2002, ClearOne changed the terms of the Distributor Agreement, with the distributor to require payment for products within 60 days after shipment by ClearOne to the distributor.  The distributor certifies that ClearOne will make no exception to the Agreement's terms.  (See id., ¶ 6.)

17. Each of the distributors signed the certification.  Mr. Oltz of vSO has now testified that he only signed the certification due to pressure by Ms. Flood.  However, Mr. Starin was also present when Mr. Oltz signed his certification, and has testified that

Mr. Oltz did not complain that the certification was inaccurate when he signed it.  (Starin Dep. at 134.)  Mr. Skiparnias has indicated that he only signed the certification on behalf of PT&T as a "favor" to Ms. Flood.  Mr. Francis, on behalf of NewComm, added an "Addendum to Distributor Certification for NewComm Technologies," whereby he made changes or additions to paragraphs 3 and 4, and deleted paragraph 5.

## D.     THE ALLEGED PAY- AS-YOU-SELL DISCUSSIONS.

18.     There is no dispute that ClearOne did not strictly enforce the Distributor Agreement requiring payment within 90 days of shipment.  There is, however, substantial disagreement over whether the distributors were, or could be, orally relieved of their legal obligation to pay within 90 days as the written contract required, or whether ClearOne, in the exercise of its business judgment, chose not to enforce that requirement.  The SEC has presented evidence that the distributors claim they had reached an oral understanding with Tim Morrison (and Misty Chalk) allowing them to pay as they sold product.  This evidence is incomplete, inconsistent and misleading.  For example, while Mr. Starin testified that he could not pay within 90 days or until the product was sold (Starin Dep., at 75-76) he has stated that he "was never released of my responsibility to pay within 90 days," but the Company would work with him, given market conditions.   (Starin Statement at 30.)  Starin also repeatedly confirmed to the auditors that he had a 90-day payment term (see Exhibit 2, above) and certified to ClearOne his legal obligation to pay within the terms of the Distributor Agreement.  (See Exhibit 3, above.)

-10-

19.   Similarly, vSO confirmed with the independent auditors the terms of its written agreements and the absence of any contingent pay-as-you-sell agreement. (See Oltz Dep. at 107.)  In fact, Mr. Oltz, at his deposition, stated that such certifications to the independent auditors were "absolutely correct."  (See id.)

20.   Mr. Colin Stevenson, managing director of Production Audio, has unequivocally stated that Production Audio had a 90-day payment term.  He was never told that Production Audio could pay for any ClearOne products on any other terms. (See Stevenson Declaration at 4)  When engineering problems were discovered in the shipment to Production Audio, Mr. Stevenson was so "concerned that Production Audio may not be able to pay for the [ClearOne products] within the 90-day terms" that he traveled from Australia to Salt Lake City to discuss the technical problems with ClearOne.  (See id. at 6.)

21.   When contacted by the SEC, Mr. Stevenson refused to confirm its suggestion that Production Audio had taken the products on consignment and told the SEC that the products were not taken on consignment.  (See id. at 7.)

22.   Directly related to the pay-as-you-sell allegation is whether Ms. Flood knew of those alleged discussions and/or the SEC's assertion that she told the distributors not to tell the auditors or analysts.  Interestingly, the only two distributors who claim that Ms. Flood (1) knew of and discussed the alleged pay-as-you-go program and/or (2) told the distributors to conceal those facts from the auditors or analysts, are

-11-

also the only two distributors (Francis and Skiparnias) who have not yet been deposed

and cross-examined as to the truthfulness and completeness of their allegations.

23.     By contrast, Mr. Oltz and Mr. Starin, the two distributors who have been

deposed (and who, according to the other two, were present at the same meetings at

which Ms. Flood allegedly made the comments) deny those allegations and insist they

never discussed the payment arrangements with Ms. Flood, nor did Ms. Flood ever ask

them to mislead or lie to anyone.

24.     The SEC cites a portion of Mr. Oltz's January 31, 2003 untested

declaration for the claim that Ms. Flood told him, "in writing there is a brick wall at 90

days, in practice there is not." (SEC's memo at 7;  Oltz Dec. at 2.)  Mr. Oltz testified in

his deposition on February 19, 2003, that this comment attributed to Ms. Flood referred

to an offer of product he never accepted and was made months before vSO became a

distributor.  Flood's comment had no application to the Distributor Agreements.  (See

Oltz Dep. pp. 44-5.)

**E.     THE ECONOMY TANKS AND EXACERBATES UNANTICIPATED PROBLEMS
WITH THE DISTRIBUTION MODEL AND PRODUCTS.**

25.     After implementing the distribution model at the end of June 2001, a

number of problems occurred over the next several quarters, from September 2001

through June 2002.  The events and aftermath of September 11 caused the economy

to go into a tailspin.  For the distributors, as Mr. Starin noted, "[i]n that October [2001] to

May [2002] period is where the wheels came off the cart."  (Starin Statement at 35.)  In

-12-

addition, difficulties with forecasting distributor needs for particular products, known as the product "mix," caused the distributors to have an excessive inventory of some products, while, at the same time, other products were on backorder. The distributors' financial difficulties were reflected in ClearOne's increasing accounts receivable. Several products, including some new video products acquired through acquisitions, were operationally or functionally defective. Other problems placed a serious strain on the distributors to fully meet their 90-day payment obligations.

26. Over time, the cumulative effect of those problems resulted in the distributors' inability to pay in accordance with the 90-day terms of their written agreements.

27. Mr. Starin expressed his frustration about the problems in a letter to Ms. Flood on December 17, 2002. Mr. Starin stated that:

> [w]ithin a few months of accepting this responsibility, the Sept 11 events occurred. All customers relinquished their cash reluctantly. Integrators were not used to paying us and, in some cases, tested our abilities to collect. Starin Distributing purchased a software module to manage our inventory, which failed. Our new software has helped dramatically. Still, some of our inventory & payment issues could likely have been reduced with effective software. The 90-days terms were not met on the majority of the inventory. We made some mistakes in what we accepted in inventory levels and, with the 'no return' policy, simply had to work through the overstock.

(Letter from Jim Starin to Fran Flood dated December 17, 2002, a copy of which is attached hereto as Exhibit 4.)

-13-

28.     Mr. Oltz also vented his concern in a letter to Ms. Flood dated December 18, 2002.  His letter noted that:

> [o]ne of the more serious [problems] is the issue regarding excessive and incorrect inventories among the distributors. I understood when we first started this model and the initial Distributor Agreements where [sic] signed that vSO was given 90 day terms on all shipments and it was vSO's intention to meet that requirement.  But as a result of an already slowing economy, 9/11 (immense impact on our region), no history in forecasting business under the distribution model, ClearOne's ineffective sales director [Tim Morrison], a reduction in dealer costs, mass confusion among our integrators as to whom they should be buying from (including having to compete with ClearOne), and of recent, the dealers [sic] slower payments due to an increasingly troubled economic condition, it has been impossible to meet those initial requirements.

(Letter from Oltz to Fran Flood, dated December 18, 2002, a copy of which is attached as Exhibit 5.)

29.     Both Mr. Starin and Mr. Oltz apologized to Ms. Flood for not having made her aware of the management problems, in particular, prior to their letters. (See Exhibits 4 and 5.)

F.     **CLEARONE DISCUSSED AND DISCLOSED DISTRIBUTION CHANNEL PROBLEMS**.

30.     ClearOne's public 1934 Act reports disclosed that accounts receivable increased from June 2001 to June 2002.  (See Form 10-K dated June 30, 2001; Form 10-Q dated September 30, 2001; Form 10-Q dated December 31, 2001; Form 10-Q dated March 31, 2002; Form 10-K dated June 30, 2002.)

-14-

31.     In addition to ClearOne's public SEC filings, the Company made EY aware of the problems associated with the new distribution model and the accounts receivable.  For example, in connection with the 2002 fiscal year-end audit (ending June 30, 23002), EY considered the Company's significant account receivables over 90 days old.  (See EY 02 000209, relevant copies of the EY documents are collectively attached hereto as Exhibit 6.)   The auditor noted "as part of our audit procedures, we reviewed payments made subsequent to year end on older accounts receivable balances, confirmed payment terms with customers (ensuring that no rights of return exist -- in the case of delinquent distributor payments), and assessed the financial strength of customers with older account balances." (Id.)

32.     The EY workpapers also reflect that EY specifically considered the fact that distributors were not paying according to terms, but instead were paying as inventory was being sold.  For example, EY notes:

> We spoke with Tim Morrison, Marketing, regarding the Starin
> Disbtibuting [sic] account.  We noted that the customer has
> a significant balance over 90 days. . . .  However, based on
> the slowing economy and an inaccurate product order mix,
> the product is taking longer to sell than anticipated.

(EY02 000490, Exhibit 7.)

33.     EY considered and rigorously tested the substantial quarter and year-end sales with the knowledge and understanding that ClearOne was pushing end of period large sales and shipments to meet its sales targets by requesting an earlier shipment date from its customers.  (See EY02 000562; EY02 000494, Exhibit 8.)  The

workpapers show that EY performed additional cutoff procedures to ensure that $5 million of product shipped at year end was real and revenue was properly recorded. (See EY02 000494; EY 02 000562, Exhibit 8.)   EY also noted in the workpapers that manufacturing companies typically have higher sales at the end of the month.

34.     ClearOne kept the public and the analyst community informed of its efforts, difficulties and results with its new distribution model.  For example, during the FY 2001 year-end conference call, Ms. Flood advised the analysts that the accounts receivable were up over 75 percent from the prior year, in part as a result of the implementation of the distribution model.  (See Fourth Quarter, fiscal year end 2001 conference call at 4-5; relevant excerpts of the analyst conference calls are collectively attached hereto as Exhibit 9.)

35.     Ms. Flood also addressed the increasing receivables during the April 23, 2002, FY 2002 third quarter call.  (See April 23, 2002, Conference Call, at 10.)   CFO Wichinski noted during the same call that "[a]lthough we were able to reduce our accounts receivable balance last quarter, the accounts receivable balance has increased significantly during the current quarter for a number of reasons, including shipment of products late in the quarter and the addition of 15 new dealers." (See id., p. 4.)

## G.      SALES NEAR THE END OF THE QUARTER.

36.      As already noted, a significant amount of ClearOne's sales to distributors occurred at the end of each quarter. (See EYO2 000494.) Such sales at the end of the quarter are not unusual under a channel sales distribution model and specifically in this industry. As ClearOne's current acting CEO, Mr. Keough, testified, "In fact you'll often hear the term "hockey stick," where it rides flat, you sell a lot at the end of the quarter. And then spend it again the next quarter, bleed it down, ride flat, do it again. It's just – it's a pretty standard model." ( Keough Dep. at 81.) This "hockey stick" pattern is exactly what EY graphed in its audit workpapers. (See EY02 000562.)

37.      Additional conference calls indicate that the large end of quarter sales was discussed with the analysts. For example, during the FY 2001 year end call, Ms. Flood noted that "[w]e are tending to see that more dealers are buying protectively looking at the latter part of the quarter because then [sic] they're looking at what jobs they have coming up." (See FY 2001 Conference Call, p. 5.)

38.      ClearOne discussed similar patterns during the April 23, 2002 call, where Ms. Flood acknowledged "a lot" of March business while January and February were "slow." (See April 23, 2002 Conference Call, at 10.) Mr. Wichinski observed a similar pattern in the August 13, 2002, conference call, noting that products were shipped late into the quarter. (See August 13, 2002 Conference Call, at 5.)

39.      Ms. Flood explained, during the August 13, 2002 call, in response to a question from one analyst concerning the shipping practice of "20/20/60," meaning 20%

-17-

in the first and second months and 60% in the final months of a quarter, "I think it's going to mirror that continually.  (See id.)

40.     Ms. Flood, during the September 26, 2002 analyst call, further commented, "[a]s I mentioned on the last call, you know, we usually see on the product front, our revenue is 20/20/60, and essentially this quarter we saw 20/20/20.  So I think going forward, you know, we're hoping, I guess as every other company in this State is hoping, that the economy will start to rebound, and that we can start to see stronger product sales and then services as a relative percentage will probably still be in the 50% range of the overall revenue, but obviously product being higher than what it performed this quarter."  (See September 26, 2002 Conference Call, at 7.)

## H.     PRODUCT RETURNS WERE WITHIN NORMAL ALLOWANCES.

41.     The SEC's expert claims that certain distributors made requests to return products demonstrating, in his view, that the products were shipped by ClearOne without any expectation that the products would be sold or paid for by the distributor. Funk Report, pp.18-20.

42.     Specifically, Mr. Funk asserts in his report (p. 19) that there never was any expectation that Production Audio in Australia would sell the products shipped by ClearOne, since Production Audio returned the goods to ClearOne.

43.     The Declaration of Colin Stevenson, the principal of Production Audio, expressly repudiates Mr. Funk's erroneous opinion and makes it clear that Mr. Stevenson fully intended to pay for the product shipped by ClearOne within the 90-

-18-

day terms, but experienced unforeseen problems with operation of the products in Australia. The products were returned under the terms of his agreement which allowed for the return of defective merchandise. (Stevenson Dec. at 6.)

44.     The SEC also relies on the Declaration of Brian Woodland, a former cost accountant at ClearOne, who provided a chart breaking down 2002 product returns into categories of "did not want," "failures," and "others." (See Exhibit C to Declaration of Brian Woodland.) The chart shows $472, 436.69 in "did not want" returns for 2002. A careful analysis of these returns by ClearOne's retained experts shows that only $13,638.77 of those returns were from distributors. (Laffer & Gottlieb Report, at 20.)

45.     Further, as a general matter, EY examined product returns during its audits and concluded that the reserves were reasonable and adequate. (Exhibit 11 to Laffer & Gottlieb Report.)

## I.    AN EMPLOYMENT DISPUTE WITH MORRISON TRIGGERS AN SEC INVESTIGATION.

46.     In December 2002, a dispute developed between Morrison and the other members of the management team concerning Morrison's relationship with Misty Chalk, a sales employee who had been a Morrison subordinate. Ms. Flood had warned Morrison in October of 2002 that he appeared to be giving special treatment, and disclosing confidential information, to Chalk.

47.     Although Morrison agreed during his October 2002 conversation with Ms. Flood to modify his behavior toward Chalk, Morrison again disclosed confidential

management information to Chalk on December 4, 2002. The management team, including Flood, Strohm, Rand and DeLoni Call (ClearOne's Director of Human Resources) ("Call"), decided on December 5, 2002, to terminate Morrison's employment with ClearOne due to his continuing breach of trust and confidence. The team intended to inform Morrison of their decision on December 9, 2002.

48.     Morrison learned that "something was brewing" on December 6, 2002, and sent an email and hand delivered a letter to Call. For the first time, Morrison alleged he had been harassed by his immediate supervisor, Ms. Flood. ClearOne retained an independent employment attorney, Jathan Janove, to investigate Morrison's allegations and placed Morrison on administrative leave.

49.     On December 12, 2002, outside counsel for ClearOne, Jennifer James of Clyde Snow Sessions & Swenson, was telephoned by Bud Headman who said that he represented Morrison. (Declaration of James at 2.) Headman told James that Morrison "wanted to be made whole." Headman threatened that if Morrison were not made whole he would go to the SEC and allege that ClearOne had improperly recognized revenue on its financial statements. This was the first time that Morrison informed ClearOne of any alleged financial reporting irregularities.

50.     When ClearOne rejected this blackmail attempt (Exhibit A to James Declaration), Morrison went to the SEC and made the allegations that are now the subject of this action.

-20-

51.     After concluding Morrison's allegations as to harassment and retaliation

for improper disclosure of confidential information were groundless, ClearOne

terminated Morrison's employment  on February 4, 2003.  Morrison then filed a claim

with the Equal Opportunity Employment Commission and the Department of Labor.

## J.     CLEARONE'S EXPERT REPORT CONCLUDES REVENUE WAS PROPERLY RECOGNIZED.

52.     After the SEC filed its complaint, ClearOne retained the certified public

accounting firm of Laffer & Gottlieb to analyze certain issues, including whether

ClearOne had improperly recognized revenue under the distribution model.

53.     After a thorough and complete review of all available data, Laffer &

Gottlieb has preliminarily concluded that:

a.     ClearOne's financial statements contained in its quarterly Forms

10-Q and annual Forms 10-K filed during fiscal year 2001 and fiscal year 2002

and its Form 10-Q for the quarter ended September 30, 2002, properly recognize

revenue.  (See id., p. 2.)

b.     ClearOne adequately disclosed to its auditors, analysts and the

investing public regarding its distribution channels, sales distributor payment

history and other matters that bear upon revenue recognition.  (See id.)

c.     That a factual dispute exists regarding only one element of the

revenue recognition requirements, which is the nature, timing and effect, if any,

of oral discussions between ClearOne and certain distributors concerning the

-21-

payment of some product sold to the distributors. (See id.) Assuming, *arguendo*, that some kind of "pay-as-you-sell" agreement or understanding existed for certain shipments and/or products, the evidence at this point is inadequate and incomplete to render an opinion as to propriety of revenue recognition. (See Id.)

      d.     Based upon the evidence reviewed and/or considered, there was real product sold and shipped to real customers with legal and binding contracts who took title to the product with no right of return. Further, ClearOne's auditors knew and specifically considered the fact that ClearOne had significant sales at or near the end of each quarter, for among other reasons to meet sales targets. (See id., p. 3.)

      e.     The auditors also knew and considered the fact that the distributors were not always paying within 90 days as the Distributor Agreements required and, consequently, that the accounts receivable for ClearOne were increasing during the time period at issue. (See id.)

54.     In the opinion of Laffer & Gottlieb, these factors and others they considered are substantially consistent with lawful conduct, and an effort to accurately recognize revenue, and substantially inconsistent with alleged illegal conduct. (See id.)

K.    **CLEARONE REVISES THE DISTRIBUTION MODEL AND MAKES OTHER CHANGES.**

55.    In the late summer of 2002, ClearOne decided it needed to more aggressively address problems with the distributors and their accounts receivable. ClearOne took substantial action prior to the SEC's investigation.

56.    The Company considered the distributors' newly-voiced complaints concerning Morrison. These complaints were expressed by Mike Oltz, owner of vSO Marketing, the company's second distributor, who identified the problem with the Company's distribution channel in his December 18, 2002 letter to the Company.

> What went wrong in my opinion was the appointment of Tim Morrison as the Direct (sic) of sales for Gentner. Fran, he knew nothing of our industry or our products, who we were selling to, how we got where we were, and more importantly, how to grow beyond that point. I knew this in my gut and almost immediately was aware of this as a witness, and not bringing this to your attention was an (sic) mistake on my part.

(Oltz letter December 18, 2002; Exhibit 5.)

57.    Jim Starin, the Company's first distributor wrote to the Company:

> October first of 2002, our terms were changed to 60 days by ClearOne. We are very carefully managing our inventory with the help of LeAnn Doane of ClearOne. She is advising us on inventory level and truly assisting us. We project our needs for 3 months out so manufacturing can be tuned to market needs. We are sharing inventory levels with other ClearOne distributors to further accelerate our path to the 60 day payment cycle. I anticipate being in compliance with the 60 day payment cycle by the end of calendar quarter 1 of 2003. We are on the right path now. I believe we could have been much earlier with more communication and

-23-

> cooperation. . . . I believe you have dealt with the cause and
> I cannot tell you how much I appreciate the appointment of
> LeAnn Doane to replace Tim Morrison as our manager.

(Starin letter, December 17, 2002; Exhibit 4.)

58.     In his February 19, 2002 deposition, Oltz, when asked if the ClearOne manufacturing model is now working smoothly, replies "It is working significantly smoother." (Oltz Dep. at 42.) Mr. Oltz was confident that he would not have to take merchandise he did not want or did not order. (Oltz Dep. at 101.)

59.     During the first two and a half quarters of fiscal year 2003 (through February 24, 2003), vSO, Starin, PT&T and NewComm have paid nearly $9.5 million to ClearOne. (Declaration of Judy Meyers, Exhibit A.)

60.     The Company hired Mike Keogh to revamp the channel. Mr. Keough has a Master's in Business Administration. His prior experience included managing a 14-state sales operation for Andrew Corporation, a $700 million manufacturer of electronic equipment. (See Keough Dep. at 5-6.)

61.     He also served as the Senior Vice President of sales for Megahertz Corporation which he grew from $20 million of sales to over $400 million of sales. In that capacity he managed distribution through over 40 distributors. He was the Vice President of Sales of U.S. Robotics, effectively managing over one-third of the corporation's business. (See id.)

-24-

62.    He was a Vice President of channel sales at 3Com Corporation and managed over 500 people.  He was the Senior Vice President of worldwide sales for Textron.  (See id.)

63.    In further reconstruction of the distribution channel, Clearone instituted a 30-60-90 day forecasting process.  Based upon input from various sources, including the distributors, the company is now able to manage manufacturing to meet demand. (See Rand Dep. at 16.)

64.    This important management change and the selection of LeAnn Doane to replace Morrison have been well-received by the distributors who now report dramatic improvement in communications and functioning of the distribution model.

65.    ClearOne appointed Greg Rand to serve as co-CEO.  Like Keough, he is extremely qualified.  He has a Master's in Business Administration and was a member of Delta Airlines' management as Assistant to the Vice President of Flight Operations.

66.    The Company instituted a policy of inventory adjustment among dealers. The policy encourages distributors to sell and exchange inventory among themselves, unburdening Company manufacturing and encouraging channel sell-through.

67.    The Company hired George E. Claffey as interim chief financial officer. Mr. Claffey has ten years of public and private company management experience and twelve years of Big Four accounting and internal auditing experience. As vice president of financial internal audit for First Data Corp., Mr. Claffey developed and led risk-based audit assessments for multiple operating units of the $4 billion NYSE electronic

transaction processing company. Most recently, Mr. Claffey was a partner and

managing director of Management & Capital, a professional financial services company.

During his ten years with the professional services firm of Deloitte & Touche,

Mr. Claffey held senior accounting and auditing positions in Houston and Atlanta, and

was the assistant director of litigation for the national office in New York.  He has been

a certified public accountant since 1983 and a certified internal auditor since 1997. He

is also currently a member of the Institute of Internal Auditors and the Association of

Certified Fraud Examiners.  (See Press Release dated February 2, 2003, attached

hereto as Exhibit 10.)

      68.     Tim Morrison has been terminated and Misty Chalk has resigned.

      69.     ClearOne's audit committee has actively engaged in an independent

investigation of the SEC's claims.  It has engaged its own counsel and an independent

accountant.  It has interviewed distributors and employees and continues to investigate

the Company's accounting practices.  A member of the audit committee meets at least

twice weekly with Mr Keogh.  (Keogh Dep., p. 52-54.)

      70.     The Company, on January 20, 2003, issued a press release advising

caution regarding reliance on the company's financial statements pending the outcome

of full investigation of the matters at issue in this lawsuit, even before public trading in

ClearOne common stock was halted on January 21, 2003 pursuant to NASDAQ's

request for additional information.

# ARGUMENT

## I.   THE SEC HAS FAILED TO MEET ITS LEGAL BURDEN FOR A PRELIMINARY INJUNCTION.

### A.   The Injunction Statutes

The SEC seeks a preliminary injunction against ClearOne under Section 17(a)(1)-(3) of the Securities Act of 1933 ("Securities Act") and Sections 10(b), 13(a), and 13(b) of the Securities Exchange Act of 1934 ("Exchange Act").  The Exchange Act, as amended, U.S.C. § 78u(d), provides in relevant part:

> Whenever it shall appear to the Commission that any person is engaged or is about to engage in acts or practices constituting a violation of any provision of this chapter, the rules or regulations thereunder, [or rules of exchanges and other designated entities], it may in its discretion bring an action in the proper district court . . . to enjoin such acts or practices, and upon a **proper showing** a permanent or temporary injunction or restraining order shall be granted without bond.  15 U.S.C. § 78u(d).

The Securities Act has a nearly identical provision in 15 U.S.C. § 77(t).

The "proper showing" test does not provide the courts with much substantive guidance, but the vagueness appears purposeful.  Congress intended and authorized and relied on the courts to exercise their inherent equitable powers.  "When Congress grants district courts jurisdiction to enjoin those violating or about to violate federal statutes, it is authorizing the exercise of 'equity practice with a background of several hundred years of history.'"  SEC v. Unifund Sal, 910 F.2d 1028, 1034 (2nd Cir. 1990) (citation omitted).

In this case, the adverse impact of an injunction on ClearOne overwhelmingly outweighs the minimal benefits, if any.

**B.     A Preliminary Injunction is an Extraordinary Sanction with a Substantial Risk of Mistake Because of an Incomplete Record.**

The law is clear that a preliminary injunction is an extraordinary remedy.  This fundamental legal principle is as applicable to an SEC injunctive action as any other.  In SEC v. Pearson, 426 F.2d.1339 (10th Cir. 1970), the Tenth Circuit upheld the trial court's denial of a preliminary injunction, finding such an injunction to be an "extraordinary measure."   Pearson at 1343.  The United States Supreme Court has noted:

> [I]t frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion."   Mazurek v. Armstrong, 117 S. Ct. 1865, 1867 (1997) (emphasis added by Court; footnotes and citations omitted).

The Tenth Circuit recently reaffirmed the extraordinary nature of a preliminary injunction, "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." Greater Yellowstone Coalition v. Flowers, 2003 W.L. 361562, page 4, (10th Cir. 2003) (citation omitted). The SEC's right to an injunction is neither clear nor unequivocal.

A preliminary injunction is extraordinary because the movant is seeking a severe and potentially injurious result on a partial record, well in advance of a full trial on the merits.  As explained by the Fourth Circuit, "[G]ranting a preliminary injunction requires

that a district court, *acting on an incomplete record*, order a party to act, or refrain from acting, in a certain way. The danger of a mistake in this setting is substantial." <u>Scotts Co. v. United Industries Corp.</u>, 315 F.3d 264, 283 (4th Cir. 2002) (emphasis added) (citations and quotations omitted).

The inherent danger of a mistake is enhanced in this case because of the technical and complicated nature of the accounting issues, and the fact that many critical witnesses have still not been deposed. The SEC injunction, if granted, could destroy ClearOne and have far-reaching and long-lasting effects on hundreds of innocent employees and thousands of shareholders. And, because the SEC is not required to post a bond, the traditional safeguard against a wrongfully issued injunction is absent.

### C.  The Purpose of an Injunction is Not Punitive.

"The purpose of injunctive relief is not to punish the violator, but to deter him from committing future infractions of securities laws." <u>Bonastia</u>, 614 F.2d at 911 (citations omitted). In this regard, the SEC must show a "cognizable risk of future violation, something more than the mere possibility which serves to keep the case alive." <u>SEC v. Bausch & Lomb</u>, 565 F.2d 8, 18 (2nd Cir. 1977). In that regard, the SEC further minimizes or ignores the substantial steps the Company took *prior* to the SEC's investigation to address any potential problems with the distribution sales model. (<u>See</u> Statement of Facts ("S.F."), at 69.) Perhaps the greatest irony of the SEC's demand for an injunction is that the person the distributors squarely blame for the

-29-

problems, i.e. the SEC's chief witness -- Tim Morrison, has been terminated from employment at ClearOne.  Thus, the likelihood of a future violation has been eliminated.

### D.    The Two-Prong Test.

In order to obtain a preliminary injunction in this case, the SEC must prove both: (1) a past or ongoing violation; and (2) a "reasonable and substantial likelihood that the defendant, if not enjoined, will violate securities law in the future."  <u>SEC v. Pros International, Inc.</u>, 994 F.2d 767, 769 (10th Cir. 1993); <u>Unifund</u>, 910 F.2d at 1036;  <u>SEC v. Bonastia</u>, 614 F.2d 908, 912 (3rd Cir. 1980); <u>SEC v. Price Waterhouse</u>, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992).

### (1)    The SEC Must Establish Every Element of Each Alleged Violation on Which it Seeks an Injunction.

The SEC seeks an injunction on seven distinct causes of action, which include the following rules and regulations: §17(a)(1) of the Securities Act; § 17(a)(2) of the Securities Act;  § 17(a)(3) of the Securities Act; § 10(b) of the Exchange Act; Rule 10b-5; § 13(a) of the Exchange Act; Rules 12b-20, 13a-1, 13a-13, 13b2-1, and 13b2-2. For each purported statutory basis for the injunction the SEC must establish every one of the of the elements of the underlying offense.  <u>Aaron v. Securities and Exchange Comm.</u>, 446 U.S. 680 (1980); <u>Pros International</u>, <u>supra</u>, 994 F.2d at 769.  The SEC simply relies on conclusory allegations rather than setting forth the requisite elements.

(2)     **The SEC Must Establish Scienter for the § 10(b) and § 17(a)(1) Allegations, and the Lack of Scienter Bears Heavily on the Remaining Allegations.**

The term "scienter" is used to refer to "a mental state embracing intent to deceive, manipulate, or defraud." Aaron, supra, 446 U.S. at 686 n.5; SEC v. Blatt, 583 F.2d 1325, 1333 (5th Cir. 1978) (reversing a permanent injunction). When scienter is an element of the underlying offense, the SEC must prove scienter before an injuction may issue. The Supreme Court in Aaron held that the SEC must prove scienter in civil enforcement actions to enjoin violations of § 10(b) of the Exchange Act and § 17(a)(1) of the Securities Act, but does not need to establish scienter for §§ 17(a)(2) and 17(a)(3) of the Securities Act.  Aaron, supra, 446 U.S. 680 at 695; Pros International, 994 F.2d at 769. There is no clear judicial statement of the degree of scienter required to enjoin the alleged violations of §§ 13(a) and 13(b) of the Exchange Act.

Most importantly, even where scienter is not an element of the underlying offense, the degree of scienter "bears heavily" on the court's decision on whether or not to grant injunctive relief.  SEC v. Haswell, 654 F.2d 698, 699 (10th Cir. 1981); Pros International, supra, both affirming the trial court's denial of the SEC's request for injunction.

As the Court in Haswell noted, "'it will almost always be necessary for the Commission to demonstrate that the defendant's past sins have been a result of more than negligence.'" Id. at 700, citing Aaron 446 U.S. at 703 (concurring opinion).  In Pros International, the Tenth Circuit commented that "[A] knowing violation of Sections 10(b)

-31-

or 17(a)(1) will justify an injunction more readily than a negligent violation of 17(a)(2) or (3)."  994 F.2d at 769 (10th Cir. 1993).

> **(3)    The SEC Must Demonstrate a Reasonable and Substantial Likelihood that ClearOne, if not Enjoined, Will Violate Securities Laws in the Future.**

To meet the second required element for an injunction the SEC must prove a "reasonable and substantial likelihood" that the defendant, if not enjoined, will violate securities laws in the future.  The Tenth Circuit set forth this requirement in Pros International:

> An injunction based on the violation of the securities laws is appropriate if the SEC demonstrates a **reasonable and substantial** likelihood that the defendant, if not enjoined, will violate securities laws in the future.

Pros International, 994 F.2d at 769 (emphasis added).

The SEC has presented no compelling evidence that would support a finding of a future violation.  ClearOne has terminated Morrison, the person who the distributors blame for their problems.  ClearOne has advised each distributor that they are now on strict "net 60 day" terms.  (S.F. 16(f).)  ClearOne has also implemented stricter internal collection and monitoring practices to ensure control of the accounts receivable, distributor inventory, and revenue recognition.  (S.F. 16, 17.)

Further, even in the case of a past violation, the SEC must establish "a sufficient evidentiary predicate to show that such future violation may occur."  Aaron, supra, 466 U.S. at 700.  The mere fact that a defendant has engaged in illegal conduct does not

justify granting injunctive relief.   Blatt, 583 F.2d at 1333.  In Pearson, the Tenth Circuit

affirmed the trial court's denial of a preliminary injunction, stating that "where the

likelihood of any continuing menace to the public does not in reason exist it has been

recognized that the extraordinary measure of a preliminary injunction is not justified."

Pearson, 426 F.2d at 1343 (10th Cir. 1970) (citations omitted).   In SEC v. Pros

International, the Tenth Circuit noted that:

> We are required to look beyond alleged violations of
> professional standards and determine "whether there was a
> likelihood that the defendant if not enjoined will again
> engage in the illegal conduct."  The mere fact that the
> defendant will remain an accountant is insufficient for
> injunction. Pros, 994 F.2d at 769 citing Bonastia, 614 F.2d
> at 912 (3rd Cir. 1980).

**(4)   Under the Totality of Circumstances, There is No "Reasonable
and Substantial Likelihood" of a Future Violation by ClearOne.**

The courts have considered the totality of circumstances in weighing the

reasonable and substantial likelihood of a future violation.[2]  As set forth in detail in the

Statement of Facts, 24-28, the Company has substantially revised the distribution

model and made other important management changes.  In response to the

distributors' newly-voiced complaints, ClearOne replaced Mr. Morrison.  This change

has been very well received by the distributors who now report dramatic improvement in

communication and functioning of the distribution model.  The Company has also hired

---

[2]      See, e.g. Blatt, 583 F.2d at 1335 (5th Cir. 1978); Aaron , 446 U.S. at 701; SEC v. Savoy
Industries, 587 F.2d 1149, 1168 (D.C. 1978); U.S. v. United Medical and Surgical Supply Corp. , CCH
Fed. Sec. L. Rep. ¶ 97, 402 (10th Cir. 1993).; Pros International , 994 F.2d at 769.

Mike Keogh, a person with substantial experience in operating distribution channels. Further, the Company has instituted a policy of inventory adjustment among dealers, as well as implementing a forecasting process by which the distributors more directly forecast their own needs for new inventory. The Company has also hired Mr. Claffey, as interim chief financial officer, an individual with substantial public and private company management experience, as well as accounting, auditing and fraud examination experience. Further, ClearOne's audit committee has actively engaged in independent investigation of the SEC's claims and other problems related to the distribution channel. It has retained its own counsel and an independent accountant to conduct the ongoing investigation.

All of these important steps abundantly demonstrate that there is no reasonable and substantial likelihood of any future securities violations at ClearOne.

### (5)    Adverse consequences of an injunction.

The preliminary injunction seeks mandatory changes, not the maintenance of status quo. In the highly competitive environment in which ClearOne operates, an injunction and the consequent concern of ClearOne's ongoing viability, may lead to loss of substantial business; loss of many jobs (Defendant's employees, distributors); damage to the reputation of the Company and individuals; and the inevitable class action strike suits.

This exacerbation of the current uncertainty in the minds of customers, fueled by ClearOne's competitors, about the future of the Company and its ability to service its

-34-

products will have a chilling effect on sales -- seriously harming the substantial progress ClearOne has made in the last fiscal quarter.  It will be imposed at an unnecessary cost since there is no likelihood the Company will engage in future securities law violations.

The adverse consequences are especially severe and must meet a heightened legal and evidentiary standard because the SEC seeks a change of management, the appointment of a special monitor and the imposition of an injunction against future violations which it asserts would require a restatement of past SEC financial filings (10Qs and 10Ks).  (See SEC's Complaint and Memo.)  The changes sought are unequivocally in the nature of "mandatory" relief and would be extremely disruptive to ClearOne's business.  As one Court noted:

> [w]here, as here, the moving party seeks a preliminary
> injunction that is mandatory rather than prohibitory in form,
> an even greater showing is required. Mandatory injunctions
> are not granted unless extreme or very serious damage will
> [otherwise] result and are not issued in doubtful cases.

Topps Chewing Gum, Inc. v. Major League Baseball Players Ass'n, 641 F. Supp. 1179, 1190 (S.D.N.Y.1986) (internal quotations omitted).

## II.    CLEARONE'S REVENUE RECOGNITION WAS PROPER.

The foregoing legal analysis is critical to the Court's determination of the SEC's evidentiary and legal burden in seeking a preliminary injunction.  Before reaching the question of reasonable and substantial "likelihood of future violation" the SEC must first establish a past or existing violation.

**A.    "Channel Stuffing" -- A Red Herring.**

The SEC contends that "[c]hannel stuffing is a fraudulent practice for the purposes of a Section 10(b) or Section 17(a) violation."  (SEC Memo at 21.)   The SEC grossly overstates the law.  The practice referred to as "channel stuffing" is neither *per se* fraudulent nor necessarily a violation of any securities law.

The SEC cites three cases as authority for its proposition: Harvey v. Jasper Retirement Trust v. Ivax Corp., 920 F. Supp. 1260 (S.D. Fla.1995); In re Lotus Dev. Corp. Sec. Litig., 875 F. Supp. 48, (D. Mass.1995); and In re Compaq Sec. Litig., 848 F. Supp. 1307, 1319-20 & n. 37 (S.D. Tex.1993).  The SEC's reliance on these cases as authority for its overbroad contention is misplaced.  First, none of these cases involved a preliminary injunction, nor did the Courts reach the merits of the claims: Harvey involved a motion to dismiss; In re Lotus involved a motion to stay discovery, and In re Compaq involved motions to dismiss and for summary judgment.  Second, and more importantly, so-called channel stuffing, alone, is not illegal.

In Greebel v. FTP Software, Inc., 194 F.3d 185, 202-203 (1st Cir. 1999), the First Circuit noted that channel stuffing evidence has some probative value, "but that value is weak."  In Greebel, the plaintiffs alleged that management knew that FTP Software's revenues during the class period would be low "and attempted to hide that fact by shifting income through channel stuffing (which remained undisclosed) and by artificially inflating income through improper revenue recognition."  Id. at 203.  Defendants allegedly booked sales as revenue even though customers had an unlimited right to

return any unsold product. Id. at 202-03. The First Circuit stated that, "[u]nlike altering

company documents, there may be any number of legitimate reasons for attempting to

achieve sales earlier. Thus, it does not support a strong inference of scienter." Id.

"There is nothing inherently improper in pressing for sales to be made earlier

than in the normal course, and we do not understand plaintiff's complaint to make such

a claim." Id.  "Indeed, some techniques that result in early booking of sales, such as

channel stuffing, might prove to be entirely legitimate, depending on the specific facts."

In re: Cabletron Systems, Inc., 311 F.3d 11, 34 (1st Cir. 2002).  In the case at bar,

ClearOne manufactured, shipped, and sold large amounts of product to the distributors

at the end of each fiscal quarter.  The distributors took title to the product with no right

of return. (S.F. 13-17.)  EY specifically considered the fact that the Company was

pushing up sales, at least in part, to meet its sales targets.  (S.F. 17.)

Here, the SEC's channel stuffing allegation is even weaker than the claim

dismissed in Greebel because it is undisputed that the distributors have no right of

return and none of the individual Defendants in this case sold any ClearOne stock

during the alleged violation period.

**B.     The Distributor Agreements: Clear and Unequivocal Statements of
         the Distributors' Obligations.**

As noted earlier, ClearOne entered into four commercial, arms-length, Distributor

Agreements with its distributors.  To briefly summarize, the pertinent terms are as

follows:

#### (1)      Minimum Quantities, Title Passes, No Right of Return.

The distributor is granted the exclusive right to sell ClearOne's products in a delineated territory.  (Distributor Agreement ¶ 1).  The distributor agrees to purchase a minimum of $500,000 worth of product each and every fiscal quarter.  (Distributor Agreement ¶ 5(b)).  The distributor is required to maintain an adequate level of inventory. (Distributor Agreement ¶ 5(a)).  Title to products passes to the distributor "at the time of delivery to carrier" (Distributor Agreement ¶ 3(g)).  There is no right to return products absent a defect (Distributor Agreement ¶ 12(b)).

#### (2)      Payment.

As to payment, the Distributor Agreement requires "payment within ninety (90) days from the date of shipment, provided that any portion of an invoice paid within sixty (60) days of shipment will be subject to discount of two percent (2%).[3]  (Distributor Agreement ¶ 3(d).)

#### (3)      Full Integration, Nonwaiver, and Modification by Writing Only.

The Distributor Agreement clearly states:

> This Agreement contains the entire understanding of the parties with respect to the matters set forth herein, and supersedes all prior or contemporaneous representations, statement, understandings, and agreements.  Both parties

---

[3]      The SEC has argued that the alleged side deals transformed the Agreement into a consignment contract with the distributors.  The agreements could not, even then, be a consignment contract.  The elements of a consignment are: i)  Title does not pass to consignee; ii)  Owner (consignor) may recall goods - consignee may return; and iii) Owner sets price - consignee receives commission.  Manger v. Davis, 619 P.2d 687 , 690 (Utah 1980).

agree that there are no other agreements to which either is a
party that conflict with, change or modify the terms of this
Agreement, or otherwise prevent this Agreement from
becoming effective." (Distributor Agreement ¶13(a).)

Further, "All amendments to this Agreement shall be in a writing signed by the

parties hereto," (Distributor Agreement ¶13(h)) and "Except as expressly provided in

this Agreement, waiver by either party or failure by either party to claim a breach of any

provisions of this Agreement, shall not be a waiver of any breach or subsequent

breach, or have the effect of any waiver of such provisions." (Distributor Agreement

¶ 13(f).)

ClearOne thus has an integrated written contract with its distributors which,

significantly, contains both a provision prohibiting oral modifications and a nonwaiver

provision.  The contract term prohibiting oral modification of the express written terms

disallows exactly the type of ambiguous oral side agreements the SEC has alleged

existed.  As a matter of law, under the clearly stated terms of the contract, no alleged

oral modification would have been enforceable by ClearOne or a distributor.  Utah Code

Ann. § 70A-2-209(2)[4] provides that "A signed agreement which excludes modification or

rescission except by a signed writing cannot be otherwise modified or rescinded...."

See Monroc, Inc. v. Jack P. Parson Construction Company, 604 P.2d 901 (Utah 1979)

(2-209 provision is enforceable if express requirement for modifications to be in writing,

---

[4]     The Uniform Commercial Code applies to distributorship agreements.  See, Quality
Performance Lines v. Yoho Automotive, 609 P.2d 1340, 1342 (Utah 1980) ("Although a distributorship
agreement is more involved than a typical sales contract, it is subject to Utah's Uniform Commercial
Code.")

-39-

citing U.S. Fibres, Inc. v. Procter & Schwartz, Inc. 358 F. Supp. 449 (E.D. Mich. 1972);

South Hampton Co. v. Stinnes Corp. 733 F.2d 1108,1116 (5th Cir. 1984)("contract's no-

oral-modification clause bars proof of any such change," citing § 2-209). Accordingly,

there could be no oral modification of the written Distributor Agreement. Any attempt by

Morrison or a distributor to orally modify the written Distributor Agreement is legally

ineffective.

ClearOne's forbearance to exercise available remedies should not and cannot be

construed to relieve the distributors of their legal obligation -- as the Distributor

Agreements recognize. ClearOne did demonstrate leniency with regard to collecting

payment from its distributors following the events of September 11, and the resulting

economic recession. There are no accounting rules that deal with the events and

aftermath of September 11. But while ClearOne worked with its distributors, that did not

operate as a waiver of the term requiring the distributors to make payment within 90

days because of the antiwaiver provision found in ¶13(f) of the Agreement. Nonwaiver

clauses are enforceable. See Hale v. Ford Motor Credit Co., 374 So. 2d 849. (Ala.

1979). ClearOne could work with its distributors without waiving its legally enforceable

right to payment. That its distributors could not always make timely payment, and that

ClearOne would work with them in collecting the accounts receivable, is not some

nefarious scheme as alleged by the SEC, but rather a common commercial necessity,

and one that was fully disclosed to the auditors and analysts. ClearOne's business

decision was a prudent and permissible judgment to cope with the economic downturn

and other factors that led to the distributors' inability to always pay for the products sold

to them within the 90 days provided for in the Distributor Agreement.

> **(4)      Distributors Certified Payment Terms and Accounts Payable to ClearOne's Auditors.**

Each distributor confirmed to ClearOne's outside auditors, EY, the payment

terms of the Agreement and in some quarters, specifically confirmed that payment for

product was <u>not</u> contingent on end sales.  This is true.  Further, public policy does not

permit the distributors to disavow statements they made to independent auditors in the

course of an audit of a publicly traded company.  At no time were the distributors

relieved of their obligation to pay.

> **(5)      Revenue Recognition Was Proper Based on the Obligations of the Distributors, the Information Provided to EY and Applicable Accounting Standards.**

As EY concluded, revenue was properly recognized.  This is a conclusion shared

by the preliminary report of Laffer & Gottlieb:

> Based upon our analysis of all of the exhibits and testimony
> examined to date, we have concluded that title passed to the
> Distributors at the time of shipment, and the Distributor had
> no right to return product.  Accordingly, revenue arising from
> sales may be recognized if collectibility is reasonably
> assured. . . .  EY examined managements' judgments,
> tested the balances of the individual receivables, and
> evaluated the adequacy of the Company's bad debt reserve.
> EY satisfied themselves as to the reasonable assurance of
> collectibility of the revenue. *Preliminary Report* at 28.

C.     **The Appointment of A Special Monitor is Neither Appropriate Nor Necessary.**

The SEC has requested the appoint of a Special Monitor to "oversee ClearOne's relationship with distributors and resellers."  (SEC Memo at p. 32.)  The SEC cites five cases in support of this proposition, all of which are readily distinguishable.   Reebok v. Marnatech Enterprises, Inc., 970 F.2d 552, 559 (9th Cir. 1992) involved a claim for a preliminary freeze of assets under the Lanham Act and thus is wholly inapplicable to a securities context.  SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978) discusses only the standards of disgorgement, and references a receiver in passing with respect to compensation.  SEC v. Wencke, 622 F.2d 1363, 1360-69 (9th Cir. 1980) discusses a federal court's equitable authority to issue a variety of ancillary relief measures, but provides no analysis, guidance, or standards for appointing a receiver.  Similarly, Manor Nursing, 458 F.2d 1082 (2nd Cir. 1972) is distinguishable in that it involved the appointment of a trustee only after a non-jury trial and the trustee was appointed merely to hold the proceeds of disgorgement.  Finally, SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2nd Cir. 1971) does not consider the appropriateness or necessity of a special monitor.

The SEC's factual basis for the appointment of a Special Monitor is equally deficient.  First, the SEC's criticisms of the current interim co-CEOs is inappropriate and without foundation or merit.  The co-CEOs are qualified, Mr. Keough especially so, since he has over twenty five years in channel sales distribution models.  (S.F. 60-63.)

-42-

Moreover, the SEC does not even mention Mr. Claffey, the new interim CFO for

ClearOne, a CPA, certified internal auditor and certified fraud examiner.  His

qualifications and experience to oversee the financial matters of ClearOne are

impeccable.  The SEC's allegations regarding potential retaliation are pure conjecture,

not supported by a single reference to the record which would allow this Court to make

such a finding of potential retaliation.

## CONCLUSION

The SEC has failed to meet its heightened burden for the issuance of a

preliminary injunction.  It has neither proven a prior securities law violation, nor any risk

of a future violation, much less a reasonable and substantial likelihood of such a future

violation.  The impact of preliminary injunction would be disastrous for ClearOne and

would effectively negate the benefits of the considerable management and operational

changes ClearOne has made over the past several months.

Dated this 27th day of February 2003.

CLYDE SNOW SESSIONS & SWENSON

RODNEY G. SNOW
NEIL A. KAPLAN
Attorneys for Defendant ClearOne

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction was hand-delivered this 27th day of February 2003, to the following:

Thomas M. Melton
Karen L. Martinez
Securities and Exchange Commission
50 South Main Street, Suite 500
Salt Lake City, Utah 84144
        Attorneys for Plaintiff

Milo Steven Marsden
Bendinger, Crockett, Peterson & Casey
170 South Main, Suite 400
Salt Lake City, Utah 84101
        Attorneys for Defendant Strohm

Max D. Wheeler
Richard A. Van Wagoner
Snow Christensen & Martineau
10 Exchange Place, Suite 1100
Salt Lake City, Utah 84111
        Attorneys for Defendant Flood

-44-

# Exhibits/ Attachments to this document have **not** been scanned.

# Please see the case file.